NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TKC AEROSPACE, INC.,**
*Appellant,*

**v.**

**JANET A. NAPOLITANO, Secretary of Homeland Security,**
*Appellee.*

---

2012-1423

---

Appeal from the Civilian Board of Contract Appeals in No. 2119, Administrative Judge R. Anthony McCann.

---

Decided: October 4, 2013

---

DOUGLAS C. PROXMIRE, Patton Boggs, LLP, of Washington, DC, argued for appellant. With him on the brief was ELIZABETH M. GILL.

JEFFREY A. REGNER, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and HAROLD D. LESTER, JR., Assistant Director.

---

Before O'MALLEY, BRYSON, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON. Dissenting opinion filed by *Circuit Judge* REYNA.

BRYSON, *Circuit Judge.*

I

In 2005, the United States Coast Guard issued a solicitation seeking to lease an aircraft for use by the Coast Guard Commandant and the Secretary of Homeland Security. The lease term was one year, with five one-year option periods thereafter. TKC Aerospace, Inc. ("TKCA"), proposed a Bombardier Challenger 604 aircraft for the job and won the award.

A

Three provisions of the contract are at issue in this case. The first deals with the responsibility for maintaining the aircraft. The solicitation called for the submission of two proposed maintenance plans: a "full contract maintenance plan" and an "alternative support plan" that would provide for the use of personnel at the Coast Guard Air Station in Washington, D.C., to perform "contractor-specified tasks for which the contractor has provided training, manuals and special tools as applicable to perform." The solicitation noted that "Coast Guard Air Station Washington aviation maintenance personnel routinely perform various maintenance tasks including corrosion control." The solicitation added that "scheduled depot maintenance" would be required in addition to day-to-day maintenance of the aircraft.

TKCA's proposal explained that "all major and most minor scheduled [maintenance] will be conducted at a Bombardier factory," and it set out two options for day-to-day maintenance. Under the first option, the "Full

Contract Maintenance Plan," day-to-day maintenance would be performed by three TKCA maintenance personnel assigned to the Coast Guard Air Station in Washington, while the Coast Guard would still perform non-maintenance functions such as fueling and servicing the aircraft. Under the second option, the "USCG Maintenance Capability" plan, the Coast Guard would perform the day-to-day maintenance functions, and TKCA would supply one on-site person at the Coast Guard Air Station in Washington "to monitor the USCG maintenance of the aircraft, coordinate parts deliveries, scheduled maintenance planning and coordination, etc." The price for the full maintenance plan was $69,501.14 per month; the price of the plan with "Air Station Washington provided maintenance" was $55,126.14 per month.

The government opted for the "USCG Maintenance Capability" option, under which it would provide so-called unit-level maintenance and Bombardier, through a sub-contract with TKCA, would provide depot-level maintenance. Steve Badolato was the TKCA employee charged with monitoring the Coast Guard's maintenance on site.

The second provision at issue relates to the aircraft's availability. It assigns TKC responsibility for meeting "performance metrics," including an "Operational Availability (Ao)" of 95%. The contract explains that the Ao metric is "designed to maximize availability to Coast Guard Air Station Washington, while meeting the manufacturer's FAA-approved maintenance requirements of the aircraft." Section 5.17.5 of the contract is entitled "Computing Availability." It states:

Semi Annual Ao = Uptime/(Uptime +Downtime)

. . .

Uptime represents the amount of time the system has been fully operational based on 8760 hours per year (365 days * 24 hours/day).

> Downtime represents the sum of [Not Mission Capable Time] and [Partially Mission Capable Time] in hours or fraction thereof. The Coast Guard and the Contractor have mutually agreed that downtime will be measured from the time the Contractor is notified by the Coast Guard Air Station Washington Maintenance personnel . . . .

Specified price reductions are laid out in section 5.17.6.1 of the contract, in the event that "the required availability rate is not met over the measured semi-annual period."

TKCA's proposal represented that the Challenger 604's low maintenance requirements would "greatly reduce[]" the difficulty of meeting the 95% availability requirement. It ran through estimated calculations of scheduled and unscheduled maintenance to project a "Not Mission Capable" rate of 3.735%. That left 1.265% for partially mission capable failures, which, TKC said, "should be sufficient allowance." Thus, TKC's projections anticipated that all maintenance would count against the 95% Ao requirement and, in its view, "demonstrate[d] the ability of the TKC . . . Team to meet the minimum Availability Rate of 95%." The contract also specified that "any downtime which is caused by the Coast Guard will not be included in computing Availability."

The final disputed provision is the standard risk-of-loss provision taken from the Department of Homeland Security's supplement to the Federal Acquisition Regulation, 48 C.F.R. § 3052.228-91. It provides:

> (a) The Government assumes all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the terms of this lease while the aircraft is in the possession of the Government.

(b) In the event of damage to the aircraft, the Government, at its option, shall make the necessary repairs with its own facilities or by contract, or pay the Contractor the reasonable cost of repair of the aircraft.

B

While conducting the scheduled depot maintenance in December 2009, Bombardier discovered extensive corrosion damage beneath the carpet and around the seats inside the aircraft. During the 2008 depot maintenance, Bombardier had discovered and repaired a small amount of corrosion damage in the seat tracks. The damage discovered in 2009 was more extensive. Mr. Badolato's initial reaction was that Bombardier should have discovered the corrosion during the 2008 depot inspection, "as [the corrosion] didn't manifest itself over a one year period." Mr. Badolato stated that in his view Bombardier "should cover the 250 man hours of access required as well as compensation for the progression of corrosion over the year period." TKCA had Bombardier make the necessary repairs and did not indicate at that time that it intended to charge the Coast Guard for the repairs. The plane was returned for service on January 20, 2010.

In April 2010, TKCA received a letter from the Coast Guard stating that the aircraft was unavailable from December 19, 2009, through January 18, 2010, and that the 5% unavailability allowance in the contract was exceeded. The Coast Guard advised that it would withhold $631,414 in payments to TKCA, an amount that was later reduced to $493,988.60.

TKCA responded that the withholding violated the terms of the contract. It contended that the corrosion damage was the Coast Guard's fault because it fell within the Coast Guard's day-to-day maintenance obligations. TKCA therefore argued that it was entitled to credit for the $493,988.60 that was assessed for downtime and

should be paid an additional $135,547.58 for the cost to repair the corrosion damage. The Coast Guard refused the request.

In June 2010, TKCA submitted a certified claim in the amount of $629,536.18. When the contracting officer denied the claim, TKCA appealed to the Civilian Board of Contract Appeals.

After an evidentiary hearing, the Board denied TKCA's appeal. The Board noted that at the time the aircraft was returned to service, "there was no indication from TKCA that the corrosion repair was anything other than depot level maintenance, which was the responsibility of TKCA." With respect to responsibility for the corrosion, the Board found that the evidence was "inconclusive" and that "the cause of the corrosion is undetermined." However, the Board found that the Coast Guard had not "failed to follow the maintenance procedures required by the contract, [and] that [no] lack of maintenance on the part of USCG contributed to the corrosion problem." In the absence of a known cause of the corrosion, the Board concluded that the responsibility for repairing the damage fell on TKCA "[a]s part of Bombardier's depot maintenance program." The Board found that "TKC was responsible for all maintenance of the aircraft" under the contract, even if Coast Guard personnel were performing some of it. In support of that conclusion, the Board noted that TKCA had assumed responsibility for the 2009 corrosion repair until after the Coast Guard assessed it for the aircraft's downtime during the repair period.

The Board interpreted the risk-of-loss clause in the contract to apply only to "accidental damage to the aircraft while in the possession of the USCG [and to] ha[ve] nothing to do with corrosion or contract maintenance." The Board found that TKCA had failed to demonstrate that the damage was not caused by normal wear and tear; to the contrary, the Board noted, the wet carpet condi-

tions that TKCA contended were responsible for the corrosion constituted the type of wear and tear that rendered the risk-of-loss clause inapplicable.

Finally, the Board rejected TKCA's interpretation of the "operational availability" provision as requiring the Coast Guard to give notice to TKCA before assessing downtime. The notice provision, the Board held, "refers only to situations where the aircraft is 'down' while it is at the Coast Guard Air Station Washington, or possibly, in locations where the contractor would not know that the aircraft is down and the Coast Guard Air Station Washington would." The provision did not apply when maintenance was being performed and TKCA knew the plane was down. The Board found that TKCA's actions in December 2009 demonstrated that TKCA knew the plane was unavailable, that "downtime was an issue," and that "no notice communication from the Coast Guard Air Station Washington was necessary" to start the downtime clock running.

TKCA appealed from the Board's decision denying the claim in its entirety.

II

1. *Corrosion Control.*

TKCA first argues that the Coast Guard was responsible for the corrosion that was discovered during the 2009 depot maintenance and therefore was liable for the cost to repair that damage.

The contract provided that TKCA (or its agent, Bombardier) would be responsible for maintenance of the aircraft in two respects—through "depot maintenance," i.e., regular maintenance conducted at a Bombardier facility; and through day-to-day maintenance at the Coast Guard Air Station in Washington, the aircraft's home base. TKCA assigned an on-site project manager to the Washington base who was responsible for "[c]oordinating

. . . all the required maintenance, special equipment, and personnel requirements for [the aircraft's] operating locations" and "[d]irecting the maintenance of aircraft in coordination with the appropriate Service Center(s) scheduling managers." The contract stated that TKCA would train and instruct Coast Guard employees to perform "routine and special aircraft inspections and related aviation and administrative duties." Those duties included "corrosion control, preflight, thru flight, postflight, and other routine inspections." Significantly, TKCA agreed that its on-site TKCA project manager would "monitor the [Coast Guard] maintenance of the aircraft" and be responsible for "scheduled maintenance planning and coordination," while "[a]ll major and most minor scheduled maintenance would still be performed by the contractor Bombardier factory" or other TKCA-designated facilities by TKCA-designated agents.

As part of regular maintenance program, Bombardier performed "structural maintenance" of the aircraft, which included removing the carpets, seats, and other interior finishes in the aircraft to look for corrosion damage and repair it if found. It was during such a period of depot maintenance, in December 2009, that Bombardier discovered the corrosion and undertook the repair that became the subject of this lawsuit.

The Board found that there was no known cause for the corrosion and that under those circumstances, the contract placed the responsibility for repairing the corrosion on TKCA, which had the contractual obligation to look for corrosion during depot maintenance and to repair it when found. The Board concluded that the contract did not relieve TKCA of its responsibility to ensure that the aircraft was being properly maintained; it was just that Coast Guard personnel were performing some of the maintenance. The Board explained: "There is no merit to the argument that TKCA was not responsible to ensure that the aircraft was being properly maintained because

the [Coast Guard] had agreed that its personnel would actually perform 'routine' maintenance." *TKC Aerospace, Inc. v. Dep't of Homeland Sec.,* CBCA No. 2119, 12-1 BCA ¶ 34,937, at 171,770. Nor was there any evidence, according to the Board, that the Coast Guard failed to perform any of the routine maintenance tasks properly: "To conclude that, after years of maintaining the contract properly as directed by TKCA, the [Coast Guard] suddenly stopped doing so and caused the corrosion problem is unsupported by the evidence." *Id.*

The Board's finding that TKCA was responsible for directing routine maintenance at the Washington base and conducting major maintenance and repair at the Bombardier facility was soundly based on the terms of the contract, TKCA's maintenance plan, and the testimony of witnesses at the hearing before the Board. The Board found that the evidence did not establish that the Coast Guard failed to follow the maintenance procedures required by the contract or that any lack of maintenance on the part of the Coast Guard contributed to the corrosion problem. Moreover, the Board found that TKCA's project manager, when apprised of the discovery of the corrosion damage, admitted that Bombardier had failed to discover the corrosion damage during the 2008 depot maintenance of the aircraft. Based on those findings, which are supported by substantial evidence, the Board reasonably concluded that the Coast Guard was not ultimately responsible for failing to discover the corrosion that was found when the carpet and the seats were removed, and that the responsibility for discovering and repairing that condition rested with TKCA. The Board's decision on the issue of the responsibility for corrosion control must therefore be upheld.

2. *Notification of Aircraft Unavailability.*

TKCA argues that the contract required the Coast Guard to notify TKCA that the aircraft was unavailable

even when the plane was being serviced in the Bombardier depot designated by TKCA. The Board disagreed with that interpretation of the contract, and so do we.

The contract provides that the "downtime" for which TKCA is responsible "will be measured from the time the Contractor is notified by the Coast Guard Air Station Washington Maintenance personnel until" the aircraft is returned to ready-to-fly status. The Board sensibly interpreted that provision to require the Coast Guard to notify TKCA when the aircraft was unavailable in Washington or in some other location where TKCA would not necessarily be aware of its unavailability. It would make no sense to require the Coast Guard to notify TKCA that the aircraft was unavailable when the aircraft was in the possession of TKCA undergoing repairs or maintenance at a TKCA-designated facility. In any event, the Board pointed to substantial evidence that the Coast Guard did provide notification of the aircraft's unavailability: according to TKCA's own claim letter, the two parties "agreed that corrosion repairs should be started immediately while the aircraft was at the Bombardier maintenance facility to minimize downtime and cost for the repairs." Nothing in the contract requires that the notification be in writing or that it specifically advert to the operational availability requirement of the contract.

TKCA characterizes the "notification" provision as if it required not just notice of the unavailability of the aircraft, but notice that the Coast Guard intended to treat the period of unavailability as chargeable to TKCA. The contract language, however, does not support that interpretation. The evident purpose of the notification provision was to apprise TKCA that the aircraft was out of service so that TKCA could take steps to minimize the aircraft's downtime and avoid incurring a penalty under the contract. That purpose would not be served by requiring notification during a period when TKCA was fully

aware that the aircraft was out of service because it was undergoing maintenance at a TKCA-designated depot.

The contract provides that the calculation of downtime excludes periods in which the downtime is caused by the Coast Guard (other than normal wear and tear), that the calculation of availability "is dependent on a wide range of variables," and that availability "is to be computed and verified semi-annually." Those provisions indicate that availability is to be determined retrospectively and that it will frequently not be possible to determine in advance whether a particular period of downtime due to maintenance and repair will be chargeable against the downtime allowed by the contract. For that reason, the Coast Guard would frequently not know at the beginning of a period of maintenance and repair whether the unavailability of the aircraft during that period would be chargeable to TKCA. To require the Coast Guard to notify TKCA, at the outset of any such downtime period, that the unavailability of the aircraft would be charged against TKCA would be a pointless formality that would not advance any purpose served by the notification requirement. It would, in effect, require the Coast Guard to "notify" TKCA of the aircraft's unavailability at the outset of any period of maintenance simply to guard against the possibility that the period of maintenance would last longer than the permissible period under the contract and thus ultimately result in downtime chargeable to TKCA.

It is telling that in the course of the parties' exchanges prior to the institution of this action before the Board, and in the submissions to the contracting officer, TKCA never relied on the absence of notification as a basis for avoiding liability for the aircraft's downtime. The notification requirement, moreover, was barely mentioned in the hearing before the Board; it emerged as an issue in the case only in TKCA's post-hearing brief. Instead, the parties focused on whether the downtime was the fault of the Coast Guard, which under the plain terms of the

contract would excuse TKCA from liability for the downtime. It is thus evident from the conduct of the parties that they regarded the downtime for depot maintenance as chargeable in the calculation of aircraft's operational availability and that they did not regard advance notification as a precondition for the Coast Guard to claim chargeable downtime for depot repairs that were not the Coast Guard's responsibility.[1] Because the Board's decision on this point is supported by substantial evidence, we sustain it.

3. *Risk-of-Loss Clause.*

TKCA argues that the risk-of-loss clause in the contract applies to the corrosion damage to the aircraft and that the Coast Guard was therefore liable for the damage that TKCA repaired. The Board, however, found that the risk-of-loss clause pertains to accidental damage to the aircraft while in the government's possession, and that it does not pertain to repairs performed as a part of the contract-designated maintenance, such as abatement of corrosion caused by ordinary wear and tear.

We agree with the Board that the risk-of-loss clause does not excuse TKCA from its contractual obligation to repair the corrosion damage to the leased aircraft. As the Board pointed out, TKCA failed to show that the corrosion

---

[1] Although no penalties had been assessed for previous periods of depot maintenance, the evidence indicated that the maintenance on those occasions had been accomplished within the scheduled period (or shortly thereafter), unlike the lengthy repair period at issue in this case. Similarly, no downtime was charged for repairs that the parties agreed were the result of damage caused by the Coast Guard, but that was because the contract expressly excluded such periods from the downtime calculation.

was not the product of normal wear and tear, which is specifically excluded from the risk-of-loss clause. Even the TKCA project manager originally concluded that the corrosion damage was the result of ordinary wear and tear, and that was TKCA's position in initial correspondence with the contracting officer. Because the Board's decision that the corrosion repair performed in this case did not fall within the scope of the risk-of-loss clause is supported by substantial evidence, we uphold the Board's decision on that issue.

\* \* \* \* \*

TKCA makes a final, procedural argument, contending that the Board should have admitted evidence regarding similar corrosion problems encountered in another aircraft maintained by Coast Guard personnel at the Coast Guard Air Station in Washington. We have considered that issue and conclude that the Board did not abuse its discretion in excluding that evidence on relevance grounds. Accordingly, we affirm the decision of the Civilian Board of Contract Appeals sustaining the denial of TKCA's claim.

**AFFIRMED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**TKC AEROSPACE, INC.,**
*Appellant,*

**v.**

**JANET A. NAPOLITANO, Secretary of Homeland Security,**
*Appellee.*

_____

2012-1423

_____

Appeal from the Civilian Board of Contract Appeals in No. 2119, Administrative Judge R. Anthony McCann.

_____

REYNA, *Circuit Judge*, dissenting.

The majority affirms a determination of the Civilian Board of Contract Appeals ("Board") that Appellant TKC Aerospace, Inc. ("TKCA") bore the responsibility for corrosion repair and aircraft downtime for a corporate jet that the U.S. Coast Guard leased from TKCA. Specifically, the majority holds that substantial evidence supports the Board's determination that TKCA was liable for corrosion remediation maintenance expenses because the Coast Guard was not obligated under the contract to detect and prevent corrosion damage and, in any event, the damage fell outside the contract's "risk of loss" provi-

sion as normal wear and tear. The majority also found substantial evidence supporting the Board's conclusion that notwithstanding the Coast Guard's failure to notify TKCA that downtime was accruing, TKCA had adequate notice to be held liable for the downtime. I disagree with the majority in all three respects. Because contract interpretation is an issue of law that this court reviews *de novo*, 41 U.S.C. § 7107(b)(1); *Travel Centre v. Barram*, 236 F.3d 1316, 1318 (Fed. Cir. 2001), I conclude that the Board legally erred in interpreting the contract provisions concerning corrosion abatement expenses and sufficiency of notice. Accordingly, I respectfully *dissent*.

## I. BACKGROUND

Under the contract, the Coast Guard could have required TKCA to perform all maintenance on the aircraft. Instead, the Coast Guard opted to save $14,375 per month and assumed responsibility for its personnel to perform the daily maintenance (known as line or unit-level maintenance).[1] TKCA remained obligated to perform depot-level maintenance at scheduled intervals.[2]

---

[1] According to Coast Guard's Aeronautical Engineering Maintenance Management Manual, COMDTINST M13020.1F, unit-level maintenance normally consists of "inspecting, servicing, lubricating, adjusting, and replacing components, minor assemblies, and subassemblies. It also consists of calibrating, repairing or replacing damaged or unserviceable parts, components, and assemblies; modifying materiel, emergency manufacturing of unavailable parts; and developing/providing internal technical assistance." Joint App'x 449.

[2] By contrast, depot level maintenance "usually consists of repairing, modifying, overhauling, reclaiming, or rebuilding parts, assemblies, subassemblies, components and end items; emergency manufacturing of una-

In furtherance of its unit-level maintenance obligations, Coast Guard represented in clause 5.7.1.2 of the contract that its aviation maintenance personnel are trained to perform ground handling and servicing of Coast Guard aircraft, including conducting routine and special aircraft inspections and related aviation administrative duties such as *"corrosion control*, preflight, thru flight, post flight" and other routine inspections. Joint App'x 217 (emphasis added).[3] Related to its representations, the

---

vailable parts; and providing extensive, detailed technical assistance to using activities." *Id.* at 449–50.

[3] In pertinent part, clause 5.7.1.2 also provides:

Coast Guard Air Station Washington aviation maintenance personnel are trained to perform ground handling and servicing of Coast Guard aircraft. They conduct routine and special aircraft inspections and related aviation administrative duties. . . . Aviation Maintenance Technicians (ATM Rate) service and maintain aircraft bleed air, hydraulic and fuel systems, aircraft engines, auxiliary power units, and power train systems. They also maintain, and can conduct minor repairs on aircraft fuselage, wings and fixed and movable flight control surfaces. Some of the duties performed by Air Station Washington maintenance personnel include corrosion control, preflight, thru flight, post flight, and other routine inspections; organizational level on-equipment maintenance, servicing and routine checks, including removal and replacement of components and minor repairs on installed engines and Auxiliary Power Units (APUs); limited off-equipment maintenance capability, including, but not limited to: testing of selected LRUs, tire build-up, interior

Coast Guard's Aeronautical Engineering Maintenance Management Manual provides that the Coast Guard's "Commanding Officers are responsible for the adequate maintenance and corrosion control of aircraft in their custody and are to impose such other inspection requirements as necessary to meet differing environmental and operation conditions as may exist." Joint App'x 451. To fulfill this obligation, the Coast Guard designated specific personnel to serve as its "Corrosion Control Officer." Additionally, the Coast Guard assumed all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the term of the lease while the aircraft was in possession of the Coast Guard and agreed that, in the event of damage to the aircraft, the Coast Guard would pay TKCA's reasonable cost of repair of the aircraft. Joint App'x 201–02.

Under clause 5.17 of the contract, TKCA was obligated to maintain semi-annual operational availability of the aircraft in excess of 95% taking into account any unavailability due to maintenance, whether it be unit-level maintenance at the aircraft's Air Station Washington home or depot level maintenance performed at Bombardier's facilities elsewhere. *See* Joint App'x 220. Clause 5.17.5 of the contract provided that downtime would be measured from the time TKCA *was notified* by the Coast Guard Air Station Washington Maintenance personnel until the affected aircraft system was returned to Ready for Issue (RFI) status. *Id.*

---

refurbishment, strut removal and replacement, and repair of water and latrine systems.

During performance of the contract, the Coast Guard performed all of the tasks mentioned above except testing the LRUs, performing tire build-up, and removing and replacing the struts. Joint App'x 93.

During the first five years of the contract, few, if any, problems or disputes developed. In March 2008, during routine depot maintenance, an inspection uncovered corrosion damage on the seat track directly behind the galley bulkhead wall, the remediation of which required approximately $2,500 in repairs and did not result in appreciable downtime. As a result, TKCA assumed the cost of the repair. During the following year's scheduled depot maintenance in December 2009, however, pervasive corrosion damage was discovered under the carpets in the forward, starboard part of the aircraft, near the galley bulkhead. The repairs required the aircraft to be taken out of service for an additional 33 days beyond the scheduled maintenance, and it was not returned to the Coast Guard until January 20, 2010. Due to the aircraft's unavailability during this time, the contract's mission readiness requirement of 95% was not met.

## II. DISCUSSION

Although there is evidence that the Coast Guard could have caused the corrosion when liquids would spill onto the galley floor from the sink and other sources or when water would reach the carpet through the open forward door, *see* Joint App'x 73, there is no reason upset the Board's conclusion that the cause of the corrosion is undetermined. Joint App'x 7. Instead, this case requires review of the contract provisions concerning which party was obligated to perform preventative corrosion maintenance under the contract and, in the event of widespread damage, which party bore the risk of loss resulting from such damage. Furthermore, it presents the issue of whether the contract required the Coast Guard to provide TKCA notice before downtime could begin accruing consistent with the parties' mutual agreement. I address these issues in turn.

## A.  Corrosion Control

As an initial matter, the majority concludes that TKCA had undertaken the obligation under the contract to detect and prevent corrosion.  In doing so, it relies heavily on the fact that depot level maintenance was the responsibility of TKCA.  Even though the Coast Guard was obligated to perform "routine" daily maintenance, the majority nonetheless affirms the Board's conclusion that it was TKCA's "responsibility to ensure that the aircraft was being properly maintained *at all times*."  Joint App'x 9 (emphasis added).  I find legal error in the Board's conclusion.

Under the terms of the contract, the Coast Guard could have opted to require TKCA to perform all maintenance, but instead, the Coast Guard elected to undertake the responsibility for performing daily maintenance.  This included, but was not limited to, inspecting components and repairing or replacing damaged parts. The Coast Guard represented in provision 5.7.1.2 that its personnel were capable of performing a lengthy list of activities, most notably, corrosion control.  As it turned out, Coast Guard personnel performed all of those activities, save a select few not relevant to this case.  *See supra* note 3.  As a matter of contract interpretation, there is legal error in the Board's conclusions that TKCA was obligated to ensure that the aircraft was properly maintained at all times and that the Coast Guard only performed routine maintenance under TKCA's supervision, direction, and control.  Accordingly, I cannot agree with the majority's affirmance of the Board's conclusion that TKCA had undertaken the obligation under the contract to detect and prevent corrosion.

## B.  Risk of Loss

The majority affirms the Board's conclusion that the risk of loss provision only applied to "accidental" damage and, therefore, not did not apply in this case because the

corrosion damage was "simple wear and tear." Joint App'x 10. I disagree.

Federal Acquisitions Regulation provision 3052.228-91, which was incorporated into the contract, provides that

> [the Coast Guard] assumes all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the term of this lease while the aircraft is in possession of the [Coast Guard]. In the event of damage to the aircraft, the [Coast Guard], at its option, shall make the necessary repairs with its own facilities or by contract, or pay [TKCA] reasonable cost of repair of the aircraft.

Joint App'x 201–02. Nothing about the provision limits it to "accidental" damage. The Board erred when it imported this concept into the risk of loss provision. Here, the Coast Guard bore the risk of loss and damage to the aircraft it leased from TKCA regardless of the nature of the loss or damage as long as it was more than normal wear and tear. The majority finds substantial evidence supporting the conclusion that the corrosion damage was normal wear and tear. I disagree. It is unreasonable to conclude that a repair that requires the entire interior of an aircraft to be removed and an extensive amount of man-hours and onsite component fabrication is a repair of normal wear and tear. The Board's conclusion that the damage to the aircraft was normal wear and tear is unreasonable and not supported by the record, which instead demonstrates damage to the aircraft requiring significant repairs resulting in significant downtime. The majority incorrectly holds that substantial evidence supports the Board's conclusion. *See* 41 U.S.C. § 7107(b)(2)(C). Because the damage was not normal wear and tear, it follows that the damage to the aircraft was the type of damage covered by the risk of loss provision.

## C.  Notice

Finally, the majority affirms the Board's interpretation that the contract did not require the Coast Guard to provide TKCA with notice that downtime was accruing while the aircraft was undergoing depot maintenance and corrosion remediation at TKCA's facility.  The majority does so notwithstanding the Board's erroneous view that downtime assessments involve an after-the-fact analysis and are "retroactive" in nature.  Joint App'x 10.  The majority also affirms the Board's interpretation that the contract only requires actual notice when the aircraft is "down" at the Coast Guard's Air Station Washington home or at some other location presumably because TKCA would potentially not be aware of the aircraft's unavailability.  *Id.*  This interpretation of the contract's notice requirement is erroneous because it overlooks that the notice provision is intended to start the clock to measure accrued time, not simply acknowledge that the aircraft is down.

I find that the notice requirement is used to measure accrual of time that the aircraft is unavailable and not to simply alert TKCA that the aircraft is down, a factor TKCA would presumably know given its responsibility for depot level maintenance.  In pertinent part, provision 5.17.5 provides that "[t]he Coast Guard and [TKCA] have mutually agreed that downtime will be measured from the time [TKCA] is notified by the Coast Guard Air Station Washington Maintenance personnel until . . . [t]he affected aircraft system is returned to Ready for Issue (RFI) status."  Joint App'x 221.  The Board and the majority overlook the parties' mutual agreement that downtime would only begin accruing once the Coast Guard provided notice to TKCA of the accruing downtime.  There is nothing in the notice provision that makes it inapplicable should TKCA be aware on its own that the aircraft is "down" or otherwise undergoing service or repair.  As it is, TKCA authorized overtime and nightshift/weekend sup-

port to accelerate the corrosion remediation. Had the Coast Guard notified TKCA that it potentially faced liability for the downtime, TKCA may have been compelled to authorize additional overtime, especially since the repairs occurred during the holiday season, in order to limit potential liability.

The Coast Guard argues that, even if notice was required, TKCA had actual notice that the aircraft was "down." The Coast Guard relies on a passage cited by the Board, which indicated that the parties "agreed that corrosion repairs should be started immediately while the aircraft was at the Bombardier maintenance facility to minimize downtime and cost for repairs." Joint App'x 10. At best, this reliance amounts to post-hoc rationalization. This passage is taken from TKCA's claim letter, which was sent after the Coast Guard had already withheld invoice payments due to unscheduled downtime. The passage exemplifies the "after-the-fact analysis" of downtime erroneously endorsed by the Board. If the Coast Guard had adequately notified TKCA that it could be facing downtime, TKCA could have taken steps to limit its liability from the beginning. Because the Board erred in finding the Coast Guard's constructive notice to TKCA adequate, I conclude that the Board improperly assessed a penalty against TKCA for unnoticed downtime.

## IV. CONCLUSION

As set forth above, I conclude that the risk of loss provision obligated the Coast Guard to cover the corrosion repair cost and that the Coast Guard failed to provide adequate notice that downtime had begun accruing while the repairs were underway. From the majority's contrary conclusions, I respectfully *dissent*.